No. 13,292.

MRS. ADELINA PRIETO VS. ST. ALPHONSUS CONVENT OF MERCY.

SYLLABUS.

A child remains under the authority of his father and mother until his majority or emancipation, and is bound to obey them in everything which is not contrary to good morals and the laws; and during his minority, unless sooner emancipated, he is without legal capacity to leave the parental domicile permanently and select for himself another domicile or residence, without the consent of his parents. This is a fundamental principle that lies at the very foundation of society, and is intended to support and maintain the exercise of parental authority in the family and in the home; and to guard and protect the children of the family until their minds shall be sufficiently cultivated, and their judgment sufficiently matured, to enable them to make judicious and proper selections of places of abode for themselves.

The precise limit of time is fixed by law, and it can not in any case be either enlarged or diminished by evidence however cogent, or by argument however persuasive.

A girl of seventeen years of age has not the legal right to leave her mother's home and enter a convent with the expressed purpose of becoming a nun, without previously obtaining her consent; and should she enter a convent under such circumstances, and be received therein upon the supposition that she had obtained such consent, it is the province of the writ of *habeas corpus* to release her from such restraint and restore her to the rightful custody of her mother in due course of law.

APPEAL from the Civil District Court, Parish of Orleans. *St. Paul, J.,* acting for *King, J.,* absent.

*Lazarus & Luce (Herman Michel,* of Counsel), for Plaintiff, Appellant.

*Frank McGloin* for Defendant, Appellee.

The opinion of the court was delivered by

WATKINS, J. The present appeal involves the consideration of an application addressed to the judge of the District Court for a writ of *habeas corpus,* and the prayer of the petition is, that the Mother Superior of the St. Alphonsus Convent of Mercy, who is known to petitioner as Sister Philomena, be cited to answer, and that a writ of *habeas corpus* issue, directed to said Mother Superior, commanding her to produce, on the day specified, the body of Maria Theresa Prieto;

and that after trial, petitioner, her mother, "be declared entitled to the care, control and custody of said child, and that said child be delivered into her custody."

The petitioner alleges that her said daughter, is the issue of her marriage with her late husband, Jose L. Prieto; that said daughter, Maria Theresa was born in the Island of Cuba, on the 15th of October, 1881, and being a minor, petitioner is entitled to her care and custody.

She further represents that she had, at all times, the "care, keeping " and custody of her child, and has at no time consented to part there-" with; that she always provided for her said child as was her duty, " and in accordance with her station in life. That owing to the in-" surrection prevailing in the Island of Cuba, in the early part of the " year 1898, and in order to protect and better care for said child " during the period of said insurrection, your petitioner removed with " said child to the United States; and in order to give said child the " advantages and benefits of an education, placed her, for that pur-" pose, in the St. Alphonsus Convent of Mercy, in this city, and which " is presided over, as she is informed and believes, by a Reverend " Mother Superior, who is known in the administration of the affairs " of the convent, as Sister Philomena; and that the directions of peti-" tioner to those in charge of said institution were, to educate her said " daughter, so as to properly qualify her for the duties and responsi-" bilities of life, and in accordance with her station in life."

Petitioner further represents, "that she is a communicant of the " Roman Catholic Church, and that it was with the desire that her " said child might receive the advantages and training of the said " church, as well as for the educational purposes aforesaid, that she " placed her said daughter temporarily in said convent."

She further represents, "that until the war terminated, she was " without available means to take charge of said child, and return to " their home in the Island of Cuba; but that, at the termination of " said war, she requested her said child to return to their home, but " that owing to the influence exercised upon her said child, by those " in charge of said St. Alphonsus Convent of Mercy, she was per-" suaded, as she is informed and believes, to refuse to return; and " being impressed with the idea and belief that any attempt upon her " part to return to their home, would be violative of the laws of the " church and sacrilegious, entailing upon her Divine displeasure and

" consequent punishment," her said child declined to return with her to their home.

Petitioner further represents, "that while she is a firm believer in " the church of which she is a communicant, she will not yield her " maternal authority, and the care, custody and control of her child " to the church."

She represents further, "that she has made every effort to secure the " custody of said child, who is convalescing from a severe illness; and " that she has made frequent visits to said convent, and asked to see " and converse with her child, but has never been able to do so, except " in the presence and hearing, of one of the Sisters or attendants of " said institution."

That she "is entitled, as aforesaid, to the care and custody of the " person of her said child, and the control of her education during her " minority; and that neither the Sisters connected with said convent, " nor any one else, has the right, against the will and consent of peti- " tioner, to the care and custody of said child; and that it is the desire " of the petitioner to take her said child to her home in Cienfuegos, " Cuba, where she is able and willing to provide, care for, and educate " her said child."

She further represents, "that said child, by the influence exercised " over her at said convent, and by the supervision and restraint to " which she is subjected, is deprived of her liberty, and is now in said " convent under the control and direction of the Sisters thereof, " against the consent and wish of petitioner, who has made frequent " demands for the custody of said child," without avail.

She further represents, that "she has means and property in the " Island of Cuba at or near Cienfuegos; that said child was born and " reared there; that her family and your petitioner all reside there; " that previous to his death, the father of said child, who followed the " profession of a notary, had property and interests there, and resided " there until his death; and that by petitioner securing the custody of " said child and taking her to her home, she will have the care and " direction of a mother, and be surrounded by her relatives and family " connections."

Upon the foregoing petition, the judge *a quo* entered an order that a writ of *habeas corpus* issue and be made returnable as prayed for— directing the Civil Sheriff to serve and execute the process.

In accordance with the said order, a writ of *habeas corpus* was issued and addressed "to the Mother Superior of the St. Alphonsus " Convent of Mercy, known as Sister Philomena."

That writ directed the production, before the Honorable District Court, of "the body of Maria Theresa Prieto, and (commanded the " respondent) to then and there show cause why (she) detains said " minor child; and why said minor child should not be given into the " care and custody of the plaintiff herein, her mother, Mrs. Adelina " Prieto."

Upon the writ of *habeas corpus,* the sheriff returned that he had made personal service "on Sister Philomena, the Mother Superior of " St. Alphonsus Convent of Mercy."

The record shows, that, upon the following day, an answer was filed to the foregoing petition, of the following tenor, to-wit:

"Into court comes Reverend Mother Philomena, Superior of the " Convent of Mercy, of this city, appearing for herself and for her " said convent, who, for answer to the petition and demand herein, " avers, that Maria Theresa Prieto, is residing in the Convent of " Mercy, and has been so residing for about a year; that during said " period, her necessities have been supplied to her, even to musical " instructions by said convent, without charge or remuneration of any " kind.

Appearer says that said Maria Theresa Prieto, is and has been in said convent entirely of her own volition; that she is and has been always free to stay or to depart, as suits her best.

"Appearer specially denies that said Maria Theresa Prieto has been " impressed by her, or by any inmate of said convent, with the idea, as " alleged in the petition, that to leave said convent 'would be violative " of the laws of the church and sacrilegious, entailing upon her Divine " displeasure and consequent punishment.'

"It is averred, on the contrary, that the rules of the Order of Mercy, positively prohibit the reception of any member who has not been long and closely tried, in order to ascertain whether the applicant is fully determined to pursue the life of a religious, and understands, fully, the obligations and duties of the religious state; and that the laws of the Catholic Church do not permit the administration of religious vows, except to those whose wish to be so bound has been clearly manifested, and who have shown their disposition and proven their steadfastness by a trial of sufficiently long duration. That, accordingly, no

Prieto vs. St. Alphonsus Convent of Mercy.

one is admitted to the Order of Mercy until she has remained at least six months, and ordinarily longer, as a postulant, and then two years additional, and ordinarily longer, as a novice; that, after having thus persevered at least two years and a half in the vocation, and having shown themselves, by their conduct during said probation, proper subjects for the Order, and being of full age, then only is an applicant allowed to take her vows and enter the Order of Mercy.

"Appearer shows that, during all of said long period of probation, the applicant is, and well knows herself to be, free, in fact and in conscience, to depart at her pleasure; and it is averred that the rules of all other religious orders of the Catholic Church, are, as appearer is informed and believes, substantially the same.

"Appearer shows that the plaintiff herein, mother of said Maria Theresa Prieto, has always been allowed access to her daughter during reasonable hours; and that all allegations that the interviews, between mother and child were under surveillance, are untrue.

"It is further averred that said Maria Theresa Prieto, is free to declare for herself, in the presence of the court, whether she wishes to depart from the convent, or to remain therein; that if she elects to remain, and this court recognizes her freedom of election, then appearer is not disposed and will not close against her, the doors of the convent.

"Wherefore appearer prays to be hence dismissed with costs, and for general relief.

"(Signed)      Sr. M. Philomena,

"M. Sup."

The foregoing answer or return to the writ of *habeas corpus* was sworn to.

Upon the issues thus joined, a trial was had, and testimony was taken both for the relatrix and respondent; and, thereupon, the judge *a quo* "considering the law and evidence to be in favor of the respondent, and against the relatrix, for the reasons orally assigned, and reduced to writing afterwards, ordered that the application for the writ of *habeas corpus* be discharged at relatrix's costs;" and from that judgment, the latter prosecutes this appeal.

In the course of his reasons for judgment, the judge said:

"I don't think that any person who has heard the evidence in this " case, entertains the slightest doubt as to the fact that the child,

"Maria Theresa Prieto, is not held under restraint by the Sisters of St. Alphonsus Convent. She is free to go and come as she pleases.

"Counsel sought to establish the fact whether or not this young lady had been in any way influenced, or her mind poisoned (if that word can be used) so as to instill into it the idea that she would be breaking her vows and committing a great crime in leaving the convent at this time, if she saw fit..

"I find that the evidence does not justify any such charge. The young lady appears to be intelligent, and a person of her own mind; and she has reached the conclusion to become a nun—and she has reached this conclusion of her own volition.

"I find that the mother has not consented to her daughter becoming a nun, except on one occasion, when she momentarily gave her consent.

"This was on the day that Maria Theresa entered the convent; and it was that consent that the young girl took advantage of to enter the convent before the permission could be recalled. The question, then, is, whether or not the mother is entitled to the possession of the child?

"The evidence shows that the girl is very nearly eighteen years of age."

The judge then cites and analyzes several decisions of this court, and the provisions of Article 218 of the Civil Code, and observes:

"The courts of the different States have repeatedly decided such questions upon writs of *habeas corpus,* and held that minors of a certain age have the right to choose their own domicile. That furnishes a reasonable authority, as it were, for giving to Article 218 the interpretation that I place upon it"—that is to say, that "the word 'quit' means to leave permanently; and, therefore, a proper interpretation of Article 218 would be that a person under the age of puberty can not leave the paternal domicile permanently, and that one over the age of puberty, can."

An examination of the testimony shows the following facts:

That the relatrix, Mrs. Adelina Prieto, was the wife, and now the widow of Jose L. Prieto, and resides in Cienfuegos, Cuba, and is temporarily sojourning in the city of New Orleans. That she is a native of the Island of Cuba, and was born, baptized and married there; that her husband was a native of the Island and was born, baptized, married and died there.

That she and her husband always lived there, and that her husband died there on the 23rd day of November, 1893. That he was, by profession, a notary, and at his death left quite a valuable estate. That there were seven children issue of that marriage—five daughters and two sons.

That the subject of this controversy, Maria Theresa—the young girl then present in court and pointed out—is one of the daughters, and the youngest of them, being seventeen years of age, having been born on the 15th of October, 1881.

The statement of the relatrix is, that she arrived in the city of New Orleans on the 27th of November, 1891, accompanied by Maria Theresa and another daughter; and that one of her sons also accompanied her. That after her arrival, she left the two daughters in the St. Alphonsus Convent of Mercy, the defendant, "to learn the English language;" that her daughter-in-law accompanied them to the convent. She states that she is a Catholic in her religion, and that while they were in attendance upon the convent they boarded at the parochial school; but that she never surrendered her maternal control over her child to the Convent of Mercy. That she had always fully provided her children with everything they required, according to their station in life; that she occasionally visited her daughter in the convent, and on those occasions she informed the Sister that she was not satisfied to have her child in the convent, and that she wanted her —referring to Maria Theresa.

She states that on these occasions, her daughter expressed "a willingness to return to her, and to her custody and keeping. That on one occasion, her daughter asked her for money to pay her passage, and enough means to buy clothes and so on."

The witness indicates the time as being just before her daughter became sick in the convent. The witness then states that her daughter expressed this desire in a letter written to her while in Cuba, and that "she secured the authorization for the payment of her passage, or trip to Cuba, through the Morgan line."

That letter was filed in evidence, and is of the following tenor:

"S. F. B. Morse, Esq.,

"G. P. & T. A.

"Southern Pacific Company,

"New Orleans, La.

"Dear Sir.—On presentation of this letter, please furnish Miss " Theresa Prieto, one first-class ticket, New Orleans, to Havana, the " amount of this order will be duly credited to the steamer for which " this ticket is issued.

"Very truly, yours,

"Goldband Co.

"Havana, June 23rd, 1899."

Then follows this interrogation:

"Q.—Ask her if it was in consequence of this letter that she received from her daughter expressing a willingness to return home, that this order was procured?

"A.—Yes, sir.

"Q.—Ask her if that letter that her daughter wrote her was written in her name, the name by which she was baptized, Maria Theresa, or was it written in a name which she adopted, or which the family gave her of 'Conchita' or 'Chita' or 'Tata,' and why it was done?

"A.—She says that the letter was in her own handwriting and using her family name, but in the paragraph thereof, in the same letter, she used the colloquial name given her by the family, as 'Tata.'

"Q.—Did she give any reason for that, at any time, why she wrote in that name, and not in the name of Maria Theresa?

"A.—She says it was used in a postscript.

"Q.—Ask her when she came here to her daughter—when was it?

"A.—On the 23rd of July, last.

"Q.—Ask her how often she has seen her daughter since the 23rd of July in the convent, about?

"A.—During a period of ten days she went every day for six or seven times.

"Q.—How often after the ten days did she repeat her visits to the convent?

"A.—After that period of ten days she went about two or three times, because she was sick.

"Q.—That is the reason she did not go more often?

"A.—Yes, sir. She was sick and was attended by a physician"—that is to say the witness was sick.

It will be observed from the foregoing interrogation that the witness testified through an interpreter, she speaking no English; her native tongue being Spanish.

The following is a continuation of her testimony:

"Q.—Ask her if at any time. of the interview she had with her daughter—I speak of the last time, since her return to the States—whether her daughter ever expressed a desire to go back home?·

"A.—She says her daughter said to be patient, she was willing to go home.

"By the court:

"Q.—That Maria Theresa, her daughter, told her, the witness, that she, the·daughter, was willing to go home—to go with her?

"A.—Yes. To be patient that`she was willing to go with her.

"By counsel:

"Q.—Did your daughter give any reason when she expressed a willingness but to be patient, did she give any reason why to be patient? And if she had to get anybody else's consent, and if so what did she say?

"A.—She says what she always said. She told her to be patient, that she wanted to have a talk with the Mother Superior.

"Q.—That she wanted to have a talk with the Mother Superior, or that Theresa wanted to get the consent of the Mother Superior?

"A.—She says that the answer was to be patient, and that she was going to talk with the Mother Superior; that she was very good and undoubtedly would give her permission to leave the convent.

"Q.—That who was very good? I know that she means the Mother Superior, but it don't appear on the record that way.

"A.—Mother Philomena.

"By the court:

"Q.—Who is Mother Philomena?

"A.—The Reverend Mother Superior of St. Alphonsus Convent of Mercy.

"By counsel:

"Q.—Ask her to state the circumstances under which Maria Theresa left her home and entered the convent?

"A.—I don't know.

"By the court:

"Q.—Ask her if she does not know how her daughter got to the convent at all?

"A.—She says one day, the young lady, Theresa, left home and went to the convent for the purpose of learning English, and she was accompanied by other parties.

"Convent here, or in Cuba?

"A.—The convent here; and when the other young ladies returned home, she asked where was Theresa. The ladies' answer was that Theresa remained in the convent, and she wanted to remain there; and it was due to that matter that she fell sick and so on. And that was when she went to the convent four or five days after and she found the Mexican who interpreted the conversation."

The conversation here referred to is one that took place in the convent; and the Mexican referred to was the gentleman who interpreted what Maria Theresa said to the Sisters who did not speak Spanish.

"Q.—Ask her if her daughter was in a convent in Cuba; and ask her whether she is testifying about a convent here or in Cuba?

"A.—She says all references to a convent, is about a convent here. She never was in any other convent than the one here in New Orleans.

"Q.—Ask her, then, if she brought her daughter here herself and put her in the convent, and how long ago it was, giving dates?

"A.—She says that she has already stated to the court, no; and that that question was heard here already.

"Q.—Ask her to state it again?

"A.—She says that she never placed her in the convent. That she (Maria Theresa) went with her (witness') daughter-in-law, and it was for the purpose of learning the English language.

"Q.—I want to establish when and where she got into the convent— she went through the gates of the convent once, and I want to know when and where and how she went through them?

"A.—She says she is not positive whether it was in April or May of last year.

"Q.—Where?

"A.—The Convent of Mercy in New Orleans.

"Q.—Ask her was she, the witness, here at the time, in New Orleans?

"A.—Yes, sir.

Prieto vs. St. Alphonsus Convent of Mercy.

"Q.—Then, ask her, if after the daughter was in the convent, she, the witness, returned to Cuba? Is that the story, as I understand it?

"A.—She says that after the young lady went into the convent she, the mother, went to the Island of Cuba on business; that she, the daughter, was left behind, because she was not willing to go. She says she always offered her, when her brother Pietro returned to Cuba, that she would go with her brother.

"Q.—Ask her if she left her at school in the convent, or did the daughter intend to stay here to enter the convent as a Sister; whether or not she left her daughter here to go to school, or whether her daughter remained because she wanted to go into the convent?

"A.—She answers that she left the city and didn't take her because her daughter wanted to remain in the convent, with a promise to go to the Isle of Cuba when this brother would return.

"Q.—Please understand exactly what I want to know. What I want to know is, whether this young lady was left as a student in the convent, or whether she was left there to enter the Order?

"A.—She says she never left her; that she remained there at her own will, under the idea of taking the veil.

"Q.—Ask her, if she, the witness, knew at the time, that she wished to take the veil?

"A.—She says that her offer was after she entered the novitiate, when her brother returned to Cuba, she would accompany him, and owing to this promise she left.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"By the court:

"Q.—Ask her did she consent?

"A.—No, sir.

"Q.—Ask her how old her daughter was?

"A.—She says she didn't consent. She was satisfied although she had to accept it, she could not help it. Her promise was to return to Havana or Cuba—the promise of the child to return to Cuba, of course, that she would return with her brother; and at that time she accepted it because she did not have the means of taking her away.

"Q.—Ask her the direct question that the judge asked her: 'Did she ever, at any time, consent to her daughter taking the veil?'

"A.—No, sir; never.

"Q.—Ask her if she didn't, at all times, object and protest against it?

"A.—She says she always protested and objected against her becoming a nun.

      *        *        *        *        *        *

"By the court:

"Q.—I asked the age of the daughter at that time?

"A.—She says about seventeen; not quite seventeen years of age.

"By counsel:

"Q.—Ask her if she objects now to her daughter remaining in the convent?

"A.—She answers that she not only objects, but she answers, she is opposed—'I am opposed to her remaining.'

"Q.—Ask her whether she has not objected, at all times, to her daughter being in the convent, except when she was there taking lessons in English in the parochial school?

"A.—With the intention of taking the veil, she has always been opposed to it.

"By the court:

"Q.—Ask her whether or not the Sisters knew that her daughter intended to remain in the convent for a time only and then leave it?

"A.—She says she don't know whether the Sisters knew it or not."

The following occurred on cross-examination of the relatrix:

"Q.—Now didn't you, one year ago, or over a year ago, engage a lawyer to see about getting your daughter out of the convent?

"A.—Yes, she went with him to the convent.

"Q.—Didn't your daughter then tell you and Mr. Quintero, the lawyer, that she wanted to stay there?

"A.—Yes, sir.

"Q.—She did tell you that?

"A.—Yes, sir. And that she had no means, but at the proper time she would bring the matter into court.

"Q.—But the fact is that when this daughter was appealed to by Mr. Quintero and herself, that the daughter told her and her lawyer, Mr. Quintero, that she wanted to remain; that is a fact?

"A.—Yes, sir.

"Q.—And it is also a fact that the Mother Superior then told her and Mr. Quintero, that if this young lady wanted to go that she was free to go?

"A.—They always expressed the same idea, that if the child wanted

to go away from the convent she could go, and so on; but that they could not throw her out.

"Q.—That is what the Mother Superior said to her at all times?

"A.—Yes, sir.

"Q.—That is, that they would not compel her to leave against her wish?

"A.—Yes, sir. She says that that she always expressed that the child was a minor, and she wanted to take her out of the convent.

"Q.—Ask her if she didn't go back to the Isle of Cuba after that interview; and expressed to Mr. Quintero and the Sisters that she would let things stay as they were?

"A.—No, sir; she says as soon as she was able to, she would return for her.

"Q.—Did she say that to Mr. Quintero?

"A.—No, sir. That is the reason why she abandoned the idea of taking the child; and she returned to Cuba because Mr. Quintero asked her for a certain amount of money that she could not provide. But that Mr. Quintero promised her if she had the means to bring the case in court, that she could get the child.

"Q.—Ask her if she told that to the sister?

"A.—She says that at the time one of the Sisters knew of the resolution of the lady—the resolution the mother had made up to take the child away from her, because the Sister communicated to Theresa that she knew that her mother was taking steps to take her through the court, and impressed her with the resolution to take her to Cuba.

"Q.—I want to find out positively, from this lady, whether she wishes to be understood as testifying that she didn't have untrammelled intercourse with her daughter at the Convent of Mercy, when she was there?

"A.—She says that sometimes she saw her; but at other times she was prevented from seeing her, on the same excuse that she was out— the young girl.

"Q.—I want to know whether she was spied on by the Sisters?

"A.—No, sir; she says she can't swear to something she don't know.

"Q.— Ask her did she see any spying?

"A.—She says several times she used to see Sisters around, and she don't know the English language.

"Q.—Can she swear that anybody was in the room when she was there, listening to what she was saying?

"A.—She says she can't swear, because sometimes there were other parties there, in the parlors, and she can't say whether they listened or not.

"Q.—Ask her if she was not in the convent in a room with her daughter, without any one else being in the room?

"A.—Yes, sir.

"Q.—Ask her wasn't it as a rule that she was in the room with her daughter alone?

"A.—Sometimes she was alone with her daughter, and very often she met other parties there.

"Q.—Other visitors?

"A.—Yes, sir.

"Q.—You saw your daughter in the parlor?

"A.—Yes, sir.

"Q.—And sometimes there were other visitors in the parlor, also?

"A.—Yes, sir.

"Q.—That is what she means by people being there isn't it?

"A.—Yes, sir; some Sisters with other friends.

"Q.—She says that two of the Sisters speak Spanish; ask her who they are?

"A.—Sister Lucretia is one; the other, I don't know her name.

"Q.—How did she know that they spoke Spanish?

"A.—Because they spoke with her.

"Q.—I want to know whether she swears that those two Sisters were standing anywhere near her daughter and herself when she spoke to her daughter in Spanish?

"A.—Only once, and that was at the time when she was sick, and they went with the two Sisters and when the conversation was begun between the daughter and the mother, the two Sisters sat on the bed— one at the foot and one at the head.

"Q.—That is the only occasion when these two sisters were present?

"A.—On one occasion she went to the convent to see her daughter, and there was a misunderstanding about the name of the daughter. They supposed she asked for Miss Antolina, and that was settled by an explanation. At the time Sister Lucretia came and spoke in Spanish with the daughter and her.

"Q.—That was the only occasion?

"A.—Yes, sir.

"Q.—Ask her, when she was sick was not her daughter allowed to visit her?

"A.—Yes, sir.

"Q.—How often?

"A.—The daughter went to see the mother three times.

"Q.—How long were you sick?

"A.—About eight days.

"Q.—Ask her whether or not one of the Sisters accompanied her when she went, and whether that Sister spoke Spanish?

"A.—Yes, sir; Sister Lucretia.

"Q.—Ask her whether Sister Lucretia went once, or every one of the three times?

"A.—Only once.

"Q.—One out of the three times?

"A.—Yes, sir; she says about once or twice; and the other time the Sister didn't speak Spanish."

It was developed on the re-interrogation of the relatrix, that her daughter, prior to the time she entered the convent, was at all times a respectful and obedient child, yielding to her mother's directions and commands; that she was very much astonished at the sudden change that took place in this respect after she went to the parochial school.

"By the court:

"Q.—Ask her when did that sudden change take place?

"A.—She says ever since she entered the convent.

"Q.—She has testified that her daughter has always been very obedient; ask her whether or not, when she went to the convent against her expressed will at the time, her daughter disobeyed her on that occasion?

"A.—Yes, sir.

"Q.—She disobeyed her?

"A.—Yes, sir. She says that there was an interim between the time the child entered the convent and the time she left for Havana. During that time, then, the child entered the convent, while she was absent.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q.—That was the occasion when the change took place?

"A.—Yes, sir.

"Q.—Ask her, again, so as to fix definitely the time in counsel's

mind, whether she ever consented to the child going into the convent and remaining there?

"A.—No, sir; never."

On the part of the relatrix, a witness was introduced, who claimed to have known her for several years—a lady who lives in New Orleans, and has lived there for a great many years.

In the course of her interrogation, the following occurred:

"Q.—Do you know the daughter, Maria Theresa?

"A.—Yes, sir.

"Q.—Do you know the circumstances under which they came to this country?

"A.—Yes, sir.

"Q.—Just state them, briefly?

"A.—Mrs. Prieto came to this country on account of the Cuban war.

"Q.—Do you know when she came?

"A.—Some time in 1896, I believe, during November, 1896, if I am not mistaken.

"Q.—Do you know whether she had any available means at the time?

"A.—Well; when they came here they went housekeeping, that is all I can say.

"Q.—They are people of means now, so far as you know and so far as common report is concerned?

"A.—Yes, sir.

"Q.—Did you have occasion to visit the Convent of Mercy with Mrs. Prieto?

"A.—She sent for me three or four weeks ago, and when I went to see her; she said, would you come to the convent with me and see the Mother Superior and see if she will listen to what I have to say. I said I would rather not have anything to do with this matter, unless you do things right. You know I am a Catholic myself, and you know I follow my religion; but if you want an interpretor, I will go and repeat every word you say; and she said, that is all I want you for, to repeat word for word. And we called at the convent, and I sent up my card and some Sister received us, and said the Mother Superior was sick and could not be seen; and so we left.

"Q.—Did you see Maria Theresa on that occasion?

"A.—No, sir; etc.

      *         *         *         *         *         *

And again we called, and I asked for the Mother Superior again, and I think this Sister (pointing to Mother Inez) came out and another stout Sister that speaks Spanish; and I said are you the Mother Superior, and she said no, but I am representing the Mother Superior. I said that is what I want; but owing to Maria Theresa's severe illness, her mother here wants to take (her) to Cuba. If you have no objection, she will take another Sister along and defray all the expenses; and the Sister said that she would have to explain it to the Mother Superior, and that she must come back in a few days, because we are now in retreat.

"I said what do you call a few days, and she said if it was left to her judgment, three, four or five days. Well, we called on the following Monday, but I didn't see the Mother Superior; she was sick; and they told us to come back in two days. We went back and Mother Inez came and said that the Mother Superior was quite indisposed. I told Mother Inez. that the mother of Theresa wanted to take the child to Cuba with another Sister * * * and after she was recovered, she could come back; and that she had said she was perfectly willing to leave—that is Theresa—and if she once leaves here, she never can come back.

     *      *      *      *      *      *

"Q.—Did Mrs. Prieto say that she consented to her daughter being in the convent?

"A.—Never, under no conditions; because, often when anybody spoke to her about it, she always opposed it and said she would never consent.

     *      *      *      *      *  .  *

"Q.—Did you hear Sister Theresa tell her mother that she wanted to go home?

"A.—Oh! she said in my presence, to have patience; if the mother wants me to go I will go.

"Q.—That is what Theresa said, that she would be willing to go home if the Mother Superior told her?

"A.—Yes, sir.

"Q.—And Mrs. Prieto told her daughter that the Mother Superior will never give her consent; and Mrs. Prieto said you see how sick I am from your opposition; and she put her arms around her mother and said I will go, but I have to get the Mother Superior's consent.

"By the court:

"Q.—Do I understand you to convey the impression, that this Miss Prieto said to her mother, that it was her (Miss Prieto's) desire to leave the convent?

"A.—Yes, sir.

"By counsel:

"Q.—But that she had to get the Mother Superior's consent?

"A.—At one time she said that, and at another time she said please do not repeat it to any one; those are the words of Sister Theresa in the parlor.

"Q.—Who is Sister Theresa?

"A.—Miss Maria Theresa Prieto.

"Q.—She asked her mother not to repeat that to any one?

"A.—Yes, sir, and to have patience.

"Q.—What was it that she asked her mother not to repeat?

"A.—That her wishes were to go back with her mother.

"Q.—That her wishes were to go back home?

"A.—Yes, sir.

On the cross-interrogation of this witness, the following occurred:

"Q.—Mrs. Prieto went (to the convent) to make certain propositions?

"A.—Yes, sir.

"Q.—And the object of the visits was to propound to the Sisters and to the young lady certain propositions?

"A.—Yes, sir.

"Q.—You stated that that proposition was, that this young lady should be allowed to go down to Cuba to recover her health?

"A.—Yes, sir.

"Q.—And she was to come again if she wished to come?

"A.—Yes, sir.

"Q.—And, if necessary, the mother of the young lady would pay the expenses of a Sister both ways?

"A.—Yes, sir.

"Q.—That was the only and sole proposition that you and this mother went to discuss with the Sisters?

"A.—Yes, sir.

"Q.—Was this young lady present when you submitted these matters to the Sisters?

"A.—No, sir; we only saw her on the last interview, although that was the proposition submitted to the Sisters.

"Q.—And the Sisters told you what?

"A.—That she was free to go.

"Q.—That she was free to go?

"A.—Yes, sir; but not to leave the convent; and that the Mother would not consent at the present; but if she consented, it would be later on.

"Q.—Who said that?

"A.—Mother Inez.

"Q.—Mother Inez said that she would not consent, because the Mother—

"A.—Mother Inez repeated the words half a dozen times; if the Mother Superior consents, it would not be at the present, but it would be later on, if she consented.

"Q.—Why was it, because this young lady was weak?

"A.—I can not say.

"Q.—Didn't she say it was too warm?

"A.—Yes, sir; that the Mother Superior said it was too warm.

"Q.—The Mother did not refuse to let the child go to Cuba; but she could not let her go then, because it was too warm.

"A.—If she would let her go.

"Q.—And that was the only answer that you got?

"A.—Yes, sir.

"Q.—Didn't they tell you in addition that if she choses to leave on her own accord, she could go, but they would not take her back again?

"A.—No, sir; if the Mother would consent it would be later on, (but) she did not make any promise.

\*      \*      \*      \*      \*      \*

"Q.—Wasn't what the daughter stated to you, that she would be glad if she could come back again?

"A.—She said if the Mother Superior said (she) could go, (she) would go.

"Q.—Did she say she would go without the Mother's consent?

"A.—No, sir; she told her mother to be patient and she would go.

"Q.—Didn't she tell her mother to be patient and the Reverend Mother Superior would consent?

"A.—Yes, sir; and I put the decision to her, why don't you make the choice, you see how sick your mother is.

"Q.—Now, didn't she say in answer to that question, I will go if the

Mother Superior consents; and be patient and she will consent?

"A.—She says if the Mother Superior says I can go, I will go.

"Q.—Wasn't it said altogether?

"A.—No, sir.

"Q.—Wasn't it in the same talk and in the same conversation?

"A.—Yes, sir.

"By the court:

"Q.—Allow me to ask you one question. Do I understand you to mean that Miss Prieto stated that she was desirous of leaving the convent permanently, and that the only thing that prevented her was that she could not get away?

"A.—She didn't use the word permanently, but she said I will go if the Mother Superior consents.

"Q.—What did she mean by leaving the convent—for good?

"A.—Yes, sir.

"Q.—You understood her to say that she desired to leave the Order permanently if she obtained the consent of the Mother?

"A.—Yes, sir.

      \*        \*        \*        \*        \*        \*

"By counsel:

"Q.—Please give the exact words?

"A.—She told her mother if the Mother Superior says I can go, I will go.

"Q.—Those were her exact words?

"A.—Yes, sir.

      \*        \*        \*        \*        \*        \*

"Q.—Did she say leave the convent or go?

"A.—She said leave the convent.

"Q.—You are positive of the language?

"A.—Yes, sir.

"Q.—Who were present?

"A.—Mrs. Prieto and myself, and the young girl.

"Q.—Anybody but you?

"A.—No, sir.

"Q.—You are positive on your oath that she used the word 'leave the convent'?

"A.—Yes, sir."

The deputy sheriff by whom the process was served on the defendant, through the Mother Superior, made this statement in regard to what occurred at the time of the service:

"I told her (the yong lady) that I served the paper on Mother Philomena, and I wanted to know whether she was willing to go to her mother, or appear in court; and she didn't know what to do. And I said, are you willing to go with your mother; and she said yes, providing that Mother Philomena says yes. And the Mother Superior came in, and I told her; and she said herself that she would make no standing in court, and she wanted to let it go. After a while she said to me the second time, I would rather see Mr. McGloin, and consult him about it. I said that is the right that you have, Mother; and she said well, then, it is no use to take the young lady out to-day, I will postpone it until eight o'clock to-morrow."

\*      \*      \*      \*      \*      \*      \*      \*

"The girl said she would go provided the Mother Superior consented; but she said I would like to come back provided the Mother Superior would consent that she would receive me in the convent when I came back."

Then the following interrogation occurred:

"Q.—In that discussion, was there any time when she should have the privilege of returning discussed?

"A.—If I am not mistaken it was about three years, when she would be twenty-one years of age; and then the Sister said she would be glad to take her back.

"Q.—The Sister said when she was of age she would be glad to take her back?

"A.—Yes, sir. She would leave on the promise of the Mother Superior that she would take her back when she was twenty-one years of age.

"Q.—She said she would be willing to go if she could get back voluntarily?

"A.—Yes, sir.

"Q.—She didn't indicate that she wanted to abandon her religious vocation?

"A.—She didn't say that; it was provided that at a certain time when she came back, she could get back; and the Mother Superior told her, yes she would receive her at any time she came back, providing she was of age.

"Q.—But still she said she expected and wanted to come back?

"A.—Yes; the supposition is yes; because she told me that she wanted to return in a certain length of time—when she was of age— that is three years hence."

Miss Maria Theresa Prieto, the daughter of the relatrix, who is the subject of this controversy, was interrogated as a witness on the part of the respondent, and from her examination, the following is extracted:

"Q.—What is your name, are you Maria Theresa Prieto?

"A.—Yes, sir.

"Q.—This lady who was on the stand, as the first witness, is your mother?

"A.—Yes, sir.

"Q.—Are you living now at the Convent of Mercy?

"A.—Yes, sir.

"Q.—Are you an inmate of the Convent of Mercy; you are living at the Convent of Mercy?

"A.—Yes, sir.

"Q.—How long have you been living at the Convent of Mercy as an inmate?

"A.—One year and three months.

"Q.—Now Sister, it has been alleged in the petition in this case, that you are there against your will and consent; would you state to the court whether that is a fact or not?

"A.—No, sir.  I am in the convent from my own free will; they never keep me there; I am there just because I want to be.  I am as free as a bird; I can leave the convent entirely.  I am free to go home until I make my vows; nobody keeps me there but myself.

"Q.—Would you state to the court whether the Sisters of the convent, or the Mother Superior in there are using any compulsion on you at all, please?

"A.—No, sir; they always tell me I can leave the convent if I want; I am free as a bird if I want to go.

"Q.—How long has your mother been here, the last time, about?

"A.—She says she came here on the twenty-fourth of July.

"Q.—That is the date she told you she arrived?

"A.—Yes, sir.

"Q.—Has your intercourse with your mother been restricted by the

Sisters in any way during that time—have they stopped you from seeing your mother?

"A.—No, sir; my mother used to come to see me every day; I was unable to go out of doors because I was sick, and sometimes the Sisters would pass by when my mother was there seeing me, just to see my mother, because she was from Cuba and they wanted to see her.

\*        \*        \*        \*        \*        \*        \*

"Q.—When you first went into the convent, did you have your mother's consent, or not?

"A.—One day I asked her, and she told me yes.

"Q.—Well, how long after that was it that you went in?

"A.—Two days after.

"Q.—Well, when you went in, did you have your clothes?

"A.—No, sir; I just took the clothes I had with me, and then she sent some after.

"Q.—How long after?

"A.—Oh! a few days when I needed it; I asked her, and she sent them to me.

"Q.—Have you at any time told your mother or anybody else that you were willing to give up your religious vocation and live with her in Cuba?

"A.—I have never been willing to lose my religious vocation; I have always been willing to stay and live in the convent.

"Q.—Do you know how long you would have to remain in the convent before you could take your final vows?

"A.—The Sister under whom I am, says I would have to stay two and one-half years, because I am under age."

At this point an objection to the testimony of this witness was urged on the part of the relatrix, which was to the effect, "that she has no consent to give, so as to deprive her mother of the paternal authority vested in the mother by law."

Upon this objection the court ruled as follows:

"It seems to me that this is the very merit of this case, and I will refer this objection to the merits of the case."

"Q.—That was explained to you, that you would have to stay in the convent two years before making your final vows?

"A.—Yes, sir; they told me I could not make the vows until I was of age.

"Q.—What is the rule?

"A.—It is to be a postulant five or six months, or so; and then two years or so, when you would have the right to take the final vows.

"Q.—You understand fully that you can not take the final vows until you are of age?

"A.—Yes, sir.

"Q.—I believe you stated that you never told your mother or anybody else that you would be willing to give up your religious vocation, and give up the convent for good?

"A.—No, sir; I always told my mother I was always willing to come to Cuba with another Sister, as a Sister, so I would be able to come back.

"Q.—That is all that you told your mother; that you are willing to go to Cuba as a Sister with another Sister, and to come back?

"A.—Yes, sir."

Upon cross-examination the following occurred:

"Q.—How old are you, Sister?

"A.—I will be eighteen next October.

"Q.—Your mother has always been a good, kind, affectionate and devoted mother, has she not?

"A.—Yes, sir.

"Q.—Do you love her?

"A.—Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*

"Q.—How old is your mother, do you know?

"A.—Let me see; she is fifty-three.

"Q.—Your father is dead?

"A.—Yes, sir.

"Q.—You are the youngest child, ain't you?

"A.—Yes, sir.

"Q.—Where did you live before you came to the States?

"A.—In Cienfuegos, Cuba.

"Q.—You was born there?

"A.—I was born there.

"Q.—Your mother lives there, don't she?

"A.—Yes, sir.

"Q.—All the family live there?

"A.—Yes, sir.

"Q.—You have four sisters, have you not?

"A.—Yes, sir.

Prieto vs. St. Alphonsus Convent of Mercy.

"Q.—Three are married?

"A.—Yes, sir.

"Q.—And one single?

"A.—Yes, sir.

"Q.—You have two brothers?

"A.—Yes, sir.

    *        *        *        *        *        *

"Q.—Your mother has always provided for you in accordance with your station in life, and in proportion to her means; and has always given you clothes and fed you and cared for you, and educated you?

"A.—Yes, sir.

"Q.—She has been a good mother?

"A.—Yes, sir.

"Q.—You have no complaint against her?

"A.—No, sir; none at all.

"Q.—She is a good, honest woman, is she not?

"A.—Yes, sir.

"Q.—When did you first come to the State?

"A.—To New Orleans?

"Q.—Yes.

"A.—We left Havana on the twenty-third of November, 1896.

"Q.—Why did you leave Cuba and come here; was it because of the war in Cuba?

"A.—Yes, sir—my mother said she would educate me here on account of the war.

"Q.—Your mother was born in Cuba?

"A.—Yes, sir.

"Q.—She was a Cuban?

"A.—Yes, sir.

"Q.—And your father was a Cuban?

"A.—Yes, sir.

"Q.—And your sympathies were all with the Cubans in their contest with Spain?

"A.—Yes, sir.

"Q.—And you were in a position that you would have lost all your property if the Spaniards had succeeded?

"A.—Yes, sir.

"Q.—You would have been poor then if you had lost all your property?

"A.—Yes, sir.

"Q.—Well, now, your mother brought you here to educate you?

"A.—Yes, sir.

"Q.—Your brother was here already?

"A.—Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q.—You have always been a good Catholic?

"A.—Yes, sir.

"Q.—Do you love your religion?

"A.—Yes, sir.

"Q.—Your mother is a Catholic?

"A.—Yes, sir.

"Q.—And the family are all Catholics?

"A.—Yes, sir.

"Q.—And all are good, devout Catholics, ain't they?

"A.—Some are not.

"Q.—But your mother is?

"A.—Yes, she is a Catholic.

"Q.—Well, now, when you came here to be educated, who took you to the parochial school of the St. Alphonsus Convent?

"A.—My sister-in-law; she was the only one at home that could speak a little English; and she went to the convent and spoke to the Reverend Mother Superior of the convent about the school.

"Q.—You and your sister both went to the school?

"A.—Yes, sir.

"Q.—And you would go there in the morning, and go home to lunch and back in the afternoon; and after the session of the school in the afternoon was finished, you went home?

"A.—Yes, sir.

"Q.—Did you attend to your church and to your duties regularly?

"A.—Oh! yes.

"Q.—You never told your mother, at that time, that you wanted to become a nun?

"A.—Yes, sir. I told her sometimes I wanted to be a Sister; and sometimes she didn't want to believe me; and I told her I wanted to be a Sister.

"Q.—She always objected, didn't she?

"A.—She objected; but at last she just did give me the consent; and I thought I had the vocation, and I liked to be a Sister very much.

And one day, I was asking my mother, kneeling down before her, and asking her to let me go into the convent; I just wanted to go; and she said my child, yes; and I went to the convent, and told her I was going to the church first; and then I went into the convent: I didn't bring anything but just the clothes that I needed for the day, and after that I sent for my clothes.

"Q.—Now, at all times, except on this one occasion to which you have referred, when you were kneeling down before your good mother, she always objected to your ever becoming a Sister, didn't she?

"A.—Yes, sir.

"Q.—She was willing to make every sacrifice——wasn't your mother a good Catholic, loved her church, and prepared to make every sacrifice for the church, except the sacrifice of her children?

"A.—I don't know.

"Q.—Do you know of any call that was ever made upon your mother in your recollection as a member of her church, that she didn't respond to?

"A.—Yes, sir.

"Q.—She always responded, at all times to her church?

"A.—Not to them all.

"Q.—Now you say you went to the convent, and you only took enough clothes to last you that day?

"A.—Yes, sir.

"Q.—Now, Sister, did your mother know at that time that you were going to the convent on that night to remain?

"A.—I don't think so. I told my mother; she told me to wait until Monday; I said let me go that day. I am not sure if she knew it or not. I told her I was going on that day; and she told me to wait until the next Monday. I am not sure if she knew it or not.

"Q.—Don't you know, Sister, as a matter of fact, that your mother didn't know that you were going there that night, and that your absence from home caused her great distress?

"A.—Yes, sir; they said that to me; but she told me that I could go, and to wait till Monday because my brother was coming the next day.

"Q.—She was hoping that your brother would pursuade you not to do that what you had made up your mind to do?

"A.—She told me to wait.

"Q.—That is the only time she ever consented, and on all occasions she protested and objected—isn't that true?

"A.—Yes, sir.

"Q.—You spoke of having your clothes sent to you in the convent; now isn't it true and isn't it a fact, that the only clothes that were sent to you were two night-dresses, and that they were brought by a young lady who said that you were without a night-dress in which to sleep?

"A.—I brought night-dresses for that night, and then sent for some more, and that lady brought the night dresses and some stockings.

"Q.—But no other clothes?

"A.—No, sir; because the Reverend Mother Superior gave me some, and I told her that my mother gave me the consent, and they gave me the Sister's habit.

"Q.—So the only clothes that you got were brought to you by a young lady, and that consisted of a night-dress and some stockings?

"A.—Yes, sir.

"Q.—Do you know whether the Mother Superior ever asked your mother's consent for you to take the veil?

"A.—Of my mother?

"Q.—Yes.

"A.—I don't know; I was six months in the convent before I took the veil; and once I told my mother when I took the veil, it will be easier for me to visit you, because, as a postulant, I could not go so far away; and I told my mother when I took the veil that it would be easier for me to make you a visit to Cuba.

"By the Court:

"Q.—How soon after you entered the convent was it that your mother saw you again?

"A.—I went to see my mother about a week or two after I entered. I went myself to see my mother, because she was unable to come and see me. She was not very well, and I went to see her first, before she went to see me.

"By Counsel:

"Q.—And didn't your absence from your home cause her such distress that she was taken sick; and didn't she tell you that she was sick on account of your entering the convent?

"A.—Yes; she did tell me that.

"Q.—So she was unable to go out because she was prostrate with grief; isn't that true?

"A.—Yes, sir.

"Q.—Hadn't your mother at all times, except in one instance to which you refer, when you knelt by her side, and you say, got her consent; hasn't your mother at all times protested and objected to your remaining in the convent?

"A.—Some times; and sometimes she didn't tell me anything. Sometimes I went to see her and she spoke to me about going home.

"Q.—Hasn't she always appealed to your affections and to your duty as a daughter, to go home with her, accompanied with the promise that after you had reached the age of majority, and you still felt inclined to go into the convent, that she would have to yield her consent; is that true?

"A.—Yes, sir.

"Q.—Is not that absolutely true in every particular as I have stated it?

"A.—Yes, sir; she told me that.

"Q.—Now while I don't say, and while I would not say, in the sense that would be offensive, that the Sisters have exercised any improper influence over you because they are good and noble women, haven't they persuaded you from a higher sense of duty, and in the sense as they believed, that the true way to serve your God is to serve Him in the capacity of a Sister?

"A.—They never told me anything to cause me to stay in the convent; and anytime my mother wanted to take me out of the convent, I used to tell the Mother, and she would say, 'you are free—you can leave any time you want.' They always told me I was as free as a bird 'to leave whenever I wanted.'

"Q.—Have not they always told you and is it not true, and don't you believe to-day, that your best services to God Almighty is in a capacity that you will serve Him as a Sister?

"A.—I believed that before I entered the convent, without the Sisters saying anything to me.

"Q.—But have they not strengthened you in that belief?

"A.—They just told me many times—they never told me it would be sacriligious—but I think myself I would lose my soul if I went out of the convent; I would lose the Grace of God. This is my own impression, and I want to save my soul. I think that is the true way

to serve God; not because the Sisters told me so, but because I believed that before I entered the convent.

"Q.—You had that impression because you have always been a good, honest, devout Catholic; but hasn't that belief been supported and strengthened by your readings since you have been a Sister, and by hearing the good Sisters discuss the duties, the cares, and the responsible duties which rests upon the Sister in the service of God?

"A.—I repeat and say that the Sisters never——

"Q.—You have not answered my question.

"A.—What is the question?

"(The question is repeated to witness.)

"A.—Yes, sir; of course that is our duty to say all the truth and to speak to the Lord.

   \*      \*      \*      \*      \*      \*      \*      \*

"Q.—Didn't you express a willingness to go with your mother, if Sister Philomena would not object?

"A.—No, sir. I just said I would leave the convent, if I was forced to do so by law.

"Q.—If the judge ordered you to return to your mother?

"A.—Yes, I would only leave that way; but I was not willing to leave. He said to me could I not be a Sister when I was twenty-one years, it would be just the same; and I told him it was very hard for me to leave the convent after I had been there one year and three months.

   \*      \*      \*      \*      \*      \*      \*

"Q.—Didn't you tell them, think carefully, I don't want you to say anything that is not true, and I know you won't, because I believe you respect your obligation here in court, independent of your vows, don't you know that you told your mother that you would go home with her?

"A.—No, sir; I told her one day she was crying; I said don't worry so much because she said she had so many cares. I said if you have patience our Lord will one day reward you.

"By the Court:

"Q.—What do you mean by having patience?

"A.—It means not to despair; to have patience in everything; just to wait. I thought one day I would be able to go with another Sister; to go to Cuba if she was willing to pay the passage for both. May be I could be able one day to go and see them in Cuba. I meant to have

patience; in other words, we must all have patience in our trials, and she thinks it is a trial to have me away from her; and I told her to have patience and the Lord would one day reward her.

"By Counsel:

"Q.—You think that the Lord would reward her because she had the patience to wait for your coming?

"A.—*   *   *   *   *   *   *   *   *   *

"Q.—Did Sister Philomena ever tell you that you could not take the veil until you were of age?

"A.—The Sister said I can never make my vows until I was of age —twenty-one. I never could make my vows, and I told my mother many times because she was opposed to it.

"Q.—Your mother has been very sick hasn't she for the last two or three weeks?

"A.—Yes; she was sick.

"Q.—Did you visit her?

"A.—Yes, sir; three times.

"Q.—With whom did you go on each of such occasions?

"A.—Once with Sister Theresa, a postulant, and a second time with Sister Lucretia. Another time with a postulant, I don't remember her name.

"Q.—Which one of these three spoke Spanish, or did all three of them speak Spanish?

"A.—Sister Lucretia.

"Q.—Do you know what caused your mother's recent illness; the last sickness?

"A.—I don't know, sir.

"Q.—Wasn't your act and your conduct in refusing to return with her to her home the cause, and didn't she tell you so?

"A.—When?

"Q.—When she was sick—this last sickness.

"A.—She wanted to see me and she told me if I didn't come home, she would take me by the law on Monday if I didn't go on Monday morning. I said mother you won't do that; I will see about it and will think; because I can do nothing without thinking and asking the Lord what I am going to do.

"Q.—You wanted time to think?

"A.—Yes; I wanted time to think and ask my God to give me courage; and I couldn't go Monday.

"Q.—You appealed to God to give you wisdom and direct you in the right direction?

"A.—Yes, sir.

"Q.—Who else did you appeal to on earth to assist you? Did you appeal to any one on earth; did you speak to any one of the Sisters?

"A.—No, sir.

"Q.—Not to one?

"A.—I told the Reverend Mother that my mother was going to take me by the law; and she had a letter, where they said I was unable to leave the convent. I don't know who wrote the letter that I was unable to leave the convent, and I went to the Reverend Mother and told her, and she said: 'Child, you are as free as a bird; you can leave whenever you want to. I never keep anybody here against their will, and you can go now if you want to.'

"Q.—When was it that she told you that?

"A.—I went to see my mother on a Saturday: I think it was Saturday or Sunday; I am not sure.

"Q.—When your mother told you she was going to appeal to the law to get possession and custody of you, you said by Monday morning— you said you wanted time to think—that was on Monday?

"A.—No, sir; she told me that when I came on Sunday; the first was on Saturday. She told me to come back on Sunday; and I told her I could not come back on Sunday because I had the typhoid fever and that if I was able to go on Sunday, I would go; but that I would see her on Monday, because she said she was going to take me out by the law. I said not to do that because I did not want to leave the convent.

  \*  \*  \*  \*  \*  \*  \*

"Q.—Now, Marie, do you remember the Mexican, acting as interpreter?

"A.—Well, sir; I will tell you. My mother thought it was a Mexican, but it was Mr. McCune, a Spanish man.

"Q.—Who is Mr. McCune?

"A.—I don't think I have seen him since. I never spoke to him before. As my mother says he came one day there first when she went to the convent with Mr. Quintero. She saw Mr. McCune, and he asked her if she was satisfied for me to be in the convent; and she answered no, she would never be satisfied for me to be in the convent. I was not present at all.

"Q.—She was not satisfied?

"A.—No, sir.

"Q.—You don't know what answer he gave to the Sister Superior?

"A.—No, sir; I was not there, sir.

*     *     *     *     *     *     *

"Q.—You had a conversation with the Sister about your leaving the convent on your own free will, or your leaving by the order of this court?

"A.—No, sir. Yesterday when I saw the gentleman who came there, Mr. Morel, and the other gentleman who came to me, and when she said there is the lady, I said, do I have to go, Reverend Mother? She said I suppose you will. Because you are a minor I suppose you will have to go. I went in the parlor to talk with them, and they told me I would have to go with my mother. I said to the Reverend Mother, the end of this is, I will have to go with my mother. I said at the end of four years will I be able to come back, when I am of age? And she said I suppose so, child, etc.

"Q.—Now, Miss Prieto, do you believe it is one of the rules of that order that if you leave that convent of your own free will, that you can not return * * * ?

"A.—Yes, sir.

"Q.—You want to return?

"A.—Yes, sir.

"Q.—When you are of age?

"A.—Yes, because I have to go before; and if I am able, and my mother consents, I will go back.

*     *     *     *     *     *     *

"Q.—Don't let your feelings or wishes interfere with your judgment just now. Down in the bottom of your heart, do you think you wish to stay there now, or that you would be willing to go with your mother, if you could return afterwards?

"A.—No, sir; if I am not forced, no, sir. If the law don't force me to go I am willing to remain for ever until I die. Unless the law makes me go with my mother, I will stay always. It is not my own free will to go with my mother, but my mother wants to take me out, and of course I will have to do just what the judge tells me to do. I have to obey the laws of the court.

"Q.—If you are free to go as you wish, would you go with your mother, if you could go back afterwards, if there was no law in it at

all, and they would let you come back whenever you wanted; then what would you do?

"A.—I don't think I would ever leave the convent.      .  .

"Q.—You don't think, or are you sure?

"A.—Yes; I said just now I won't.

"Q.—Your mind is not fully made up yet?

"A.—Yes it is; my mind is made up.  You know I have made up my mind to remain in the convent."

         *         *         *         *         *         *         *

The Reverend Mother Philomena was introduced as a witness upon the part of the respondent, and the following is an extract from her interrogation:

"Q.—Mother Philomena, you are Superior of the St. Alphonsus Convent of Mercy?

"A.—Yes, sir.

"Q.—Do you know Maria Theresa Prieto?

"A.—Yes, sir.

"Q.—She is an inmate of your convent?

"A.—Yes, sir.

"Q.—And for how long?

"A.—Since May, 1898.

"Q.—Would you state to the court whether or not she is there under any compulsion or restriction of yourself, or any of the Sisters?

"A.—None whatever.

"Q.—She is free to leave in conscience and law?

"A.—Yes, sir.

"Q.—Have you told her, or have any of the Sisters told her, that she would be committing a sin if she were to quit the convent?

"A.—No, sir.

"Q.—When her mother was here did you allow her free access to her daughter?

"A.—Yes, sir; every liberty possible.

"Q.—Did you tell the mother that?

"A.—I told it to her.

"Q.—Did you ever have any espionage on her?

"A.—Never.

"Q.—Did you ever put anybody to hear what the mother and daughter said to each other?

"A.—Never.

"Q.—When she came to the convent, do you know what she brought with her, and whether any clothes were sent to her afterwards?

"A.—She came, and a day or two afterwards her clothes came.

"Q.—Do you remember what clothes they were that came?

"A.—Some wearing apparel; I didn't examine them.

"Q.—You don't remember the articles?

"A.—No, sir.

"Q.—Did you have an interview with the mother of this young lady about sending a Sister on to Cuba with her daughter?

"A.—No, sir. I got a message asking to allow a Sister to go with her to Cuba.

"Q.—You were sick at the time, Mother?

"A.—Yes, sir.

"Q.—What answer did you send back?

"A.—I was not prepared to give an answer.

"Q.—Did you subsequently send an answer?

"A.—I said no.

"Q.—That you could not send a Sister there?

"A.—Yes, sir.

"Q.—Was that the request made by the mother of the young lady at that time?

"A.—Yes, sir."

On cross-examination by the counsel of relatrix, the following interrogation occurred:

"Q.—Sister, when Maria first entered the school, she was taking a course of English instructions, was she not?

"A.—Yes, sir.

"Q.—Simply a day attendant in the parochial school attached to the convent?

"A.—Yes, sir.

"Q.—Did you ever get her mother's consent to her entering the convent, personally?

"A.—Not personally.

"Q.—Was that consent ever given in your presence?

"A.—The young lady came and applied for admission, and I told her I wouldn't accept her without her mother's consent; and that she could come as soon as she received her mother's consent. She came as soon as she received her mother's consent.

"Q.—She told you that?

"A.—Yes, sir.

"Q.—You didn't hear the mother say so?

"A.—No, sir.

"Q.—The mother never confirmed it to you?

"A.—No, sir.

"Q.—She always protested?

"A.—I had very little conversation with the mother.

"Q.—On one occasion, as brief as the conversation was, she protested against her daughter remaining in the convent?

"A.—She would rather have her home.

"Q.—Didn't she object seriously?

"A.—I won't say seriously; but she objected.

"Q.—Did she not ask you to allow her daughter to return; you had no objection?

"A.—I have no objection; she is free; we are not restraining her at all.

    \*      \*      \*      \*      \*      \*      \*

"Q.—Isn't the rule nearly inflexible in its enforcement, that you only accept novices, or those who desire to become Sisters, only after the parents give their consent?

"A.—That is for the most part. Of course when one is old enough to answer for herself——but we always want the permission of the parents.

"Q.—Particularly when under twenty-one years of age?

"A.—Yes; we always exact that, because they can not make their vows until twenty-one.

"Q.—The reason for that is because they are not beyond parental control until twenty-one?

"A.—I never thought of that part of it; we desire them to have more of a trial.

"Q.—You want them with matured minds?

"A.—Yes, sir; we want them to be there and to understand what they want to do.

    \*      \*      \*      \*      \*      \*      \*

"Q.—Did you hear her say anything about whether she was willing or desirous of leaving?

"A.—She said whatever the court decided, she would do. It was not for her to remain in the convent; but what I wanted our lawyer to do was to vindicate the community.

"Q.—Did she, or not, appear to approve your action in the matter?

"A.—I dont' know whether she did or not, I didn't take notice.

"Q.—You heard Mr. Morel state, Sister, that after you had been served with the papers, that you said you did not intend to make any opposition to the delivery of the child to her mother?

"A.—I meant we are not coming to court, because we don't like this business; and to let the child decide for herself.

"Q.—Wouldn't you, as the head of the community of the St. Alphonsus Convent, as I understand you are, rather that a mother with an aching heart,' appealing here for the custody of a child, should have her, than to yield to the unmatured judgments of a child of seventeen years of age?

"A.—I am not yielding to the judgment of the child; I think that the judge should decide that; and we are willing to abide by the court's decision.

＊          ＊          ＊          ＊          ＊          ＊          ＊

"Q.—Then, you are not here opposing the mother for possession of her child?

"A.—No, sir.

"Q.—And in no manner to the delivery of the child to the mother?

"A.—No, sir; I am not opposing and whatever the court decides, we will abide by.

"Q.—Are you opposing it, or are you yielding obedience to the writ of *habeas corpus?*

"A.—In obedience to the writ of *habeas corpus*—that is why I am here.

"Q.—Have you any cause to show why the child should not be given up to its mother—I ask you as the head of the St. Alphonsus Convent of Mercy?

"A.—We are neutral in the matter. We have no reason to tell the child to go—as far as the community is concerned.

"Q.—I am asking you now, as the head of the St. Alphonsus Convent of Mercy, if you have any cause to show to this court, why the application of Mrs. Prieto, the relatrix and the mother, should not have the custody and possession of her child?

"A.—I don't understand the question.

"Q.—(Question repeated to the witness).

＊          ＊          ＊          ＊          ＊          ＊          ＊

"A.—I have no reason to except; as I have said before; we have no reason to tell her to go; I can't give you any better answer.

"Q.—And that is the only reason?

"A.—That is all that I can say."

The foregoing is a fair analysis—and in great part a repetition—of the testimony which was adduced on the trial in the District Court; and from which we gather the following summary of substantial facts, in so far as they affect the issue involved.

The relatrix as a witness states that while her daughter was attending the parochial school, she went into the convent without her consent.

That she never, at any time, gave her consent for her daughter to enter the convent; that she at all times protested against it. That while her daughter attended the parochial school, she was accompanied by other girls; and on one occasion, when they returned home without her, she enquired for her, and was, by the girls, informed, that "she had remained in the convent and wanted to remain there."

She further states that she sent her daughter to the parochial school to learn the English language; but that she never surrendered her maternal control over her on that account.

That at the time she entered the convent, her daughter was not quite seventeen years of age. That while her daughter was in the convent, she occasionally visited her, and on such occasions she informed the sisters, that she was not satisfied to have her in the convent.

That she subsequently went to her home in Cuba, and there remained for a time; but her daughter was left behind, she being unwilling to accompany her—but promising to accompany her brother when he returned home to Cuba.

That it was on this promise that she left.

It does not affirmatively appear from the evidence that the mother had free and uninterrupted intercourse with her daughter when she went to the convent to see her—except on one or two occasions. The explanation that is afforded by the evidence is, that on one or two occasions the Mother Superior was reported sick; on another, that the daughter was quite ill; on another, that there was a misunderstanding as to the name of the person who was called for; and on some occasions some of the Sisters would respond when the Mother Superior was called for.

Pr.eto vs. St. Alphonsus Convent of Mercy.

The statement of another witness, who on some occasions accompanied the mother to the convent, was to the effect that, for different reasons they were denied access to the Mother Superior frequently, and on several successive days.

The return of the respondent is to the effect that the mother "was allowed access to her daughter during all reasonable hours"—thus evidencing the fact that the mother's visits were subordinated, in a certain sense, to the discretion of the Mother Superior, under the regulations of the convent.

It appears, that on the occasion of the daughter's visits to her mother's residence in the city, she was accompanied by one or two of the Sisters, some of whom were conversant with the Spanish language; and that the Sisters were present at the interviews between the mother and daughter.

The mother declares that her daughter was, at all times, a respectful and obedient child, yielding to her directions and commands; but that she was much astonished at the sudden change that took place in this respect after she first disobeyed her, while in attendance in the parochial school, and went into the convent, against her protest.

That on all occasions, and in all interviews between the mother and the daughter, after the latter had entered the convent, she expressed a willingness to return home with her, if the Mother Superior told her she could go.

The evidence discloses that the manifest object of the mother's frequent visits to the Mother Superior, was to gain her consent for her daughter to return home.

It appears that the cause of the mother having a friend to accompany her on such occasions was, that she might act as an interpreter, the Mother Superior not being able to speak Spanish.

The statement of this friend is, that on one occasion, the daughter put her arms around her mother and said "I will go, but I have to get the Mother Superior's consent." Or, in other words, it was the daughter's desire to leave the convent, if the Mother Superior would give her consent.

That on one occasion the mother submitted to the Sister, who represented the Mother Superior, a proposition, to allow a Sister to accompany her daughter to Cuba, and that she would defray all her expenses; and her reply was that "if the Mother Superior consents, it would not be at the present but would be later on."

That witness affirms—and the statement is not denied—that "Mother Inez repeated the words half a dozen times, 'if the Mother "Superior consents, it would not be at the present, but it would be "later.'"

That on one occasion, Mother Inez stated that the Mother Superior "did not refuse to let the child go; but she would not let her go then, because it was too warm."

The deputy sheriff who made the service, as a witness states, that when he served the process on the Mother Philomena, he spoke to the girl who was present, and asked her if she was willing to go with her mother, and her reply was, "yes; provided Mother Philomena says yes;" but she also said that she would like to come back, provided the "Mother Superior would consent, that she would receive her in the "convent when she comes back."

The witness states that in the course of that conversation, the question as to the time when she would have the privilege of returning was discussed, and it was stated to be about three years, when she would be twenty-one years of age; and that the Mother Superior said "she would be glad to take her back."

That "the Sister said when she was of age, she would be glad to take her back."

That the girl said she would leave on the promise of the Mother Superior, "that she would take her back when she was twenty-one years of age."

That the girl did not say she wanted to abandon her religious vocation, but that she was willing to go, "provided, at a certain time when she came back, she could (get into the convent); and that the Mother Superior told her she would receive her at any time she came back, provided she was of age."

That "she wanted to return in a certain length of time—when she was of age—that is, three years hence."

The statement of the girl is, that she was an inmate of the convent of her own free will and consent. That she is "as free as a bird, and can leave the convent entirely."

That she is free to go home, until she makes her vows. That the Sisters of the convent and the Mother Superior tell her she can leave the convent if she wishes to do so.

She states further, that she was aware of the fact, that she would have to remain in the convent two and one-half years before she

could take her final vows, because she was under age; that the sisters told her she could not take the vows until she was of age. That the rule of the church is, that one must be a postulent five or six months, and then two years or more a novice, before she would have the right to take the final vows. That she further understood that she could not take the final vows until she was of age.

The witness relates the circumstances under which she went into the convent, as follows:

That her sister-in-law took her to the parochial school of the St. Alphonsus Convent, as she was the only one at home who could speak a little English; and she went to the convent and spoke to the Mother Superior about the school. That when she first attended the parochial school she would go in the morning, and back to lunch in the afternoon; and after the session of the school in the evening was finished, she would return home.

That she told her mother she wanted to become a nun but she didn't want to believe her. That one day, while kneeling before her, she asked her mother to let her go into the convent—"that she just wanted to go"—and her mother said, yes. That she went immediately to the convent, but did not carry any clothes; and that she afterwards sent for her clothes.

She states that upon all other occasions than the one related, her mother objected to her becoming a Sister. That she did not believe that her mother "knew at that time that she was going to the convent on that night to remain."

That she had told her mother of her intention to go, and her mother told her to wait until Monday; but she said, let me go that day.

"I am not sure if she knew it or not. I told her I was going on that day; and she told me to wait until next Monday. I am not sure if she knew it or not."

Her mother wanted her to wait till Monday because her brother was coming home the next day, and she was hoping that her brother would pursuade her not to go.

"That is the only time she ever consented, and on all other occasions she protested and objected."

She said that when she left home she "brought night dresses for that night, and then sent for some more, and that a lady brought night dresses and some stockings, but no other clothes."

That on this occasion she told the Mother Superior that her

mother had given her consent. She says that she went to see her mother a week or two after she entered the convent, because her mother was unable to come to see her—she being sick at the time; that when she went to see her mother, she told her "that she was sick on account of her entering the convent." She denied having said that she was willing to go with her mother if Sister Philomena did not object; but stated that she did say that she would leave the convent if she was forced to do so by law.

That if the judge ordered her to return to her mother, she would leave the convent in that way; but she was not willing to leave, otherwise.

She stated that Mother Philomena told her that she could not take the veil until she was twenty-one years of age.

She relates the circumstances of having a conversation with the deputy sheriff, when he came to serve the process on the Mother Superior; and states that she asked the Reverend Mother Superior if she would have to go, and that she replied "I suppose you will. Because you are a minor, I suppose you will have to go. I went into the parlor to talk with them, and she told me I would have to go with my mother. I said to the Reverend Mother that the end of this is, I will have to go with my mother, and at the end of four years I will be able to come back when I am of age, and she said I suppose so, child."

The Mother Superior as a witness states, that there is no compulsion or restriction placed upon the girl by either herself or the Sisters; and that she "is free to leave in conscience and law." She states that when her mother was here, she was allowed "as free access to her daughter as possible."

She says that she received a message from her mother proposing to allow a Sister to accompany her to Cuba, but that she replied that she was unable to give an answer. She admits that she never obtained her mother's consent personally to her entering the convent; that when the young lady came and applied for admission, she told her she wouldn't accept her without her mother's consent, but that she could come as soon as she received her mother's consent. And when she came she told her that she had her mother's consent. She said that after she came to the convent she had very little conversation with the mother; but brief as the conversation was, she protested against her daughter remaining in the convent.

She says that the rule of the Order is, only to accept novices, or those who desired to become Sisters, after the parents gave their consent—that is for the most part. "Of course, when one is old enough to answer for herself she may come, but we always want the permission of the parents. We always exact that because they can not take their vows until they are twenty-one."

She said that whatever the court decided she would do; that she was not yielding to the judgment of the child, but that she thought the judge should decide, and that the community she represented was willing to abide by the court's decision.

That she was not there in court opposing the mother for possession of her child; and "was not opposing, but whatever the court decides, she will abide by."

"We are neutral in the matter. We have no reason to tell the child to go—as far as the community is concerned."

A careful consideration of the evidence satisfies our minds of the following facts:

First, that the daughter of the relatrix was in her seventeenth year when she entered the St. Alphonsus Convent of Mercy.

Second, that she entered the convent without having previously obtained the consent, or permission of her mother to do so; notwithstanding the Reverend Mother Superior permitted her admission into the convent, on the hypothesis that she had obtained that consent.

Third, that the Mother Superior knew at the time of her admission, that the girl was a minor, and that it would be nearly three years before the law of the church would permit the administration of her religious vows.

Fourth, that the girl was, likewise, conscious of the fact that her minority was a barrier to the immediate consummation of her desire, by taking the veil; and that she was at all times conscious of her mother's opposition to her taking the veil, and becoming a nun, but her filial duty and obedience were overborne by religious enthusiasm that influenced her to act against her mother's will and yield herself to the church.

Fifth, that the Reverend Mother Superior permitted the girl to remain in the convent and to receive spiritual ministrations therein; and did not send her home after she became aware of her mother's opposition to her becoming a nun, and that she had not given her consent to her daughter entering the convent; and notwithstanding the

mother proposed to pay the expenses of a Sister, if she would allow one to accompany her daughter to Cuba, the Reverend Mother did not give her consent.

Sixth, that the girl is willing and anxious to remain in the convent, contrary to her mother's protest and entreaty, though she states that she is at perfect liberty to go to her mother; and the Reverend Mother Superior says she will not send her away if she is desirous of remaining. But, at the same time, the Reverend Mother Superior states, that she is not making opposition to the writ of *habeas corpus,* but is willing that the law should take its course. That the community she represents is perfectly ready and willing to abide by the decree of the court; and the girl expressed a willingness to do so likewise.

On this statement, our conclusion is, that the girl is, in a certain sense, in legal duress and restrained of her liberty, and her mother as her legal guardian is deprived of her custody—she being the person to whom the law confides such duty—unless, by reason of her age and intelligence, she is legally capacitated to give her consent to remain in the convent against her mother's will.

To this test, the issue must be submitted at last, as upon the determination of that question, our judgment must depend.

In attempting a solution of this problem, attention must, necessarily, be first given to the provisions of our own law, which define the relations and duties of parent and child; as it must govern our decision in the absence of allegation and proof that the *lex domicilia* of the relatrix is different from our own.

The chief reliance of the counsel for the relatrix is upon the following provisions of the Civil Code, to-wit:

"A child whatever be his age, owes honor and respect to his father " and mother." Article 215.

"A child remains under the authority of his father and mother " until his majority or emancipation." Article 216.

"As long as the child remains under the authority of his father and " mother, he is bound to obey them in everything which is not con- " trary to good morals and the laws." Article 217.

And the respondent's counsel rests its case mainly upon the following provision of the Civil Code, viz:

"A child under the age of puberty, can not quit the paternal house " without the permission of his father and mother, who have a right

"to correct him, provided it be done in a reasonable manner." Article 218.

The contention of respondent's counsel is, that the phrase "quit the paternal house," signifies a permanent departure from home; and he draws the conclusion therefrom, that as "a child *under* the age of puberty can not quit the paternal house without the permission of the father and mother"—that is permanently remove therefrom— one *above* that age can permanently remove therefrom.

And, inasmuch as the daughter of the relatrix was over the age of puberty at the time she entered the convent, she was at perfect liberty to do so, without first obtaining her mother's consent.

The contention of relatrix' counsel is, that such a construction of Article 218 does violence to the provisions of Article 216, which is found in the same chapter which treats "*of paternal authority,*" and in the same immediate connection, so that one is necessarily the context of the other, and hence the two must be construed as laws *in pari materia.*

*Per contra,* the respondent's counsel insist that Article 218 must be treated as a *special* law which serves to modify the apparently conflicting provisions of the preceding articles that are to be construed as a *general* law—the provisions of the special law governing and controlling those of the general law.

Our learned brother of the district bench accepted the interpretation placed upon that article by respondent's counsel; and that view having obtained a judgment against the relatrix, necessarily resulted.

In our opinion the argument in favor of that construction of Article 218, is ingenious, but not sound.

In the first place, it is in complete opposition to the terms of Article 216, which declares that "a child remains under the authority of his father and mother until his majority, or emancipation;" for, if the child remains under the authority of his father and mother until his majority, he can not permanently depart from his paternal home as soon as he arrives at the age of puberty.

But, if the phrase "quit the *paternal* house," be literally construed, as a temporary removal from the paternal house, it is perfectly harmonious therewith; and that view is strengthened by the remaining language of the sentence giving the father and mother the right to correct the child, supposedly for his disobedience in leaving "the paternal house without their permission."

But there are many other and comparative provisions of the Civil Code that support the contention of relatrix's counsel, and amongst others, the following may be cited:

"Birth subjects children to the power and authority of parents." Article 26.

"Age forms a distinction between those who have and those who have not sufficient reason and experience to govern their own conduct.

"But as nature does not always impart the same maturity and strength of judgment at the same age, the law determines the period at which persons are sufficiently advanced in life to be capable of contracting marriage, and forming other engagements." Article 34.

"Emancipation and the other ways which free the son and daughter " of a family from the father's authority, regard only the effects " which the civil law gives to paternal power, but changes in no " respect those that are derived from natural right." Article 35.

"Males who have not attained the age of fourteen years complete, " and females who are under twelve, are under the age of puberty; " and males who have attained fourteen years complete, and females " the age of twelve complete, are distinguished by the name of " adults." Article 36.

"Minors are those of both sexes, who have not yet attained the age " of one and twenty years complete; and they remain under the " direction of tutors till that age. When they have attained that age, " then they are said to be of full age." Article 37.

"The domicile of a minor not emancipated is that of his father, " mother, or tutor." Article 39.

"Fathers and mothers, during their life, delegate a part of their " authority to teachers, schoolmasters and others to whom they intrust " their children for their education, such as the power of restraint " and correction, so far as may be necessary to answer the purposes " for which they employ them.

"They have, also, the right to bind their children as apprentices." Article 220.

"The father and mother have a right to appoint tutors to their children, as indicated in the title: *Of Minors, of Their Tutorship and Emancipation.*" Article 219.

"The time of the engagement of minors (as bound servants or " apprentices), if there be no stipulation that it shall terminate

" sooner, shall expire for males when they attain the age of eighteen " years, and females when they attain the age of fifteen." . Article 166.

"Bound servants and apprentices and their masters, may be com- " pelled to the specific performances of their respective engage- " ments." Article 170.

"The minor not emancipated is placed under the authority of a " tutor, after the dissolution of the marriage of his father and " mother." Article 246.

"After the dissolution of marriage by the death of either husband " or wife, the tutorship of minor shildren belongs of right to the sur- " viving mother or father." Article 250.

"Whenever a minor, over the age of eighteen years, shall desire to " be relieved from the time prescribed by law for attaining the age of " majority, he shall present a petition to the judge.

    *     *     *     *     *     *     *

"This petition shall be accompanied by the written assent of the " tutor, etc." Article 385.

"If any minor, desiring to avail himself of the provisions of the " two preceding articles, has a father or mother living, the consent of " the father or mother, or both, shall be necessary to authorize the " judge to act, etc." Article 387.

The provision appertaining to the emancipation of minors found in Article 262 of the Civil Code of 1825 is as follows, viz:

"The minor, that is, the male who has not arrived to the full age of " fourteen years, and the female who has not arrived to the full age " of twelve years, are both, as to their persons and their estate, " placed under the authority of a tutor.

"Above that age, and until their majority or emancipation, they " are placed under the authority of a curator."

But in the revision of that Code in 1870 that provision was entirely abrogated, and the present Article 246, substituted in its place.

That article of the Code of 1825 was first modified by the statute of March 17th, 1828; but the entire text was changed by the statute of March 11th, 1830, and made to read as follows, viz:

"The persons and estates of minors shall in all cases be placed " under the power of tutors and under-tutors; and the powers, duties " and responsibilities of tutors and undertutors, as well as their

" liability to be removed from office, shall continue until the minor
" attains the age of majority, or are otherwise emancipated."

These provisions are found 'incorporated in the Revised Civil
Code; and they serve to show the clear intention of the Legislature to
continue the state of a child's pupilage until it arrived at the full
age of twenty-one years, unless emancipated sooner. There are other
provisions of the Code in keeping with the foregoing, but a sufficient
number have been cited for the purpose of demonstrating that the in-
terpretation which was placed upon Revised Civil Code 218 by the
judge *a quo,* can not be sustained.

And in this connection it may well be observed, that while a notable
alteration was made by the Legislature in the provisions of Article
263 of the Code of 1825, which exactly conformed to such interpreta-
tion—as has been explained—no corresponding alteration was made
in Article 236—it being exactly the same as the Revised Civil Code
218 (Article 236); and likewise, the same as the Civil Code of 1808
(Article 39 of Section 1, page 52).

But respondent's counsel directs our attention to the comparative
provisions of the Code Napoleon which are of the following tenor,
viz:

"A child can not quit the paternal mansion without the permission
" of his father, unless for voluntary enlistment after the full age of
" eighteen years."

In the discussion of this article, counsel for the respondent makes
this statement in his original brief, page 7, viz:

"Were our article (216) thus worded, petitioner might have a cause
" of action; but the fact that the framers of the Code of this State
" made so radical change from the French law, upon this point, is
" conclusive against her."

In our view the elimination of the *proviso* or exception of the
French text, strengthens the contention of the counsel of the relatrix;
for if same be omitted, it would read thus: "A child can not quit the
paternal mansion of his father", same being in terms an absolute pro-
hibition.

But our Article 218 proceeds further and says "without the per-
" mission of his father or mother, who have a right to correct him,
" provided it is done in a reasonable manner."

It seems to us quite impossible to conclude that this language
would have been employed by the law-maker, if he had intended the

phrase "quit the paternal house" to be construed as a permanent departure of the child; for, if that were so, the power of the parent to administer punishment to the child for a disobedience in that regard, would be immediately negatived by his selection of another domicile and a permanent departure from "the paternal house."

The context of Article 374 of the Code Napoleon confirms this interpretation.

"A child, at every age, owes honor and respect to his father and mother." Article 371.

"He remains subject to their control until his majority or emancipation." Article 372.

In view of these various provisions of law—all of which, in our opinion are inconsistent with the interpretation given to Revised Civil Code 218 by the judge *a quo*—we arise from the study of the question with a perfect conviction that a minor, under the age of twenty-one years, remains under the authority and control of his father, if living, and of his mother, if he be dead; and that, during his minority, unless sooner emancipated, he is without capacity under our Code to leave the paternal domicile permanently and select for himself another domicile or residence.

This is a fundamental principle that lies at the very foundation of society, and was intended to support and maintain the exercise of paternal authority in the family and the home; and to guard and protect the children of the family until their minds should become sufficiently cultivated, and their judgments sufficiently matured, to enable them to make judicious and proper selections of places of abode for themselves.

The precise limit of time is fixed by law, and it can not, in any case, be either enlarged or diminished by evidence, however cogent, or by argument however persuasive.

It is a well recognized principle of law that minors do not possess the power or capacity to make a valid and binding contract. R. C. C., 1782.

Another principle equally well recognized is that "there must be " two parties at least to every contract, so there must be something " proposed by one and accepted by another to form the matter of such " contract; the will of both parties must unite upon the same point."
Revised Civil Code 1798.

Applying the foregoing precepts to the case before us, our conclu-

sion is, that Maria Theresa Prieto, being of the age of seventeen years, approximately, when she entered the St. Alphonsus Convent of Mercy and became a postulent therein, was without legal capacity to thus permanently depart from the home of her mother—her father having died previously—against her protest, and take up her domicile or abode therein; and that any covenant or agreement she may have made to that effect, if any, with the Catholic community, through its Reverend Mother Superior, can not be recognized as having any binding effect as against the exercise of parental authority by her mother.

This principal being recognized, the province of this court is, to determine whether the judge *a quo* should have granted to the relatrix the relief she prayed for, that is, the liberation of her daughter from the convent, if she was, in a legal sense, restrained therein of her freedom, or if the mother was unduly deprived of her legal and rightful custody of her child.

It is manifestly true, that if the girl of seventeen had not the legal right to leave her mother's home and enter the convent, she had no legal power to consent to therein remain against her mother's protest.

Without attempting any refined distinctions with regard to duress, or illegal restraint, we feel safe in stating it to be a fact disclosed by the record, that the daughter has been by the Catholic community afforded an asylum, or place of abode within its convent walls, where she is entirely beyond the control and authority of her 'mother; albeit this abode and shelter was at first permitted to the child by the Reverend Mother Superior under the mistaken belief that she entered the sacred precincts of the convent with her mother's permission—she being a minor at the time of her admission.

This appears to be none the less true because of the fact that the Reverend Mother Superior affirms that the Catholic community is making no opposition to the demand of the mother of the girl, and that she is willing to permit the law to take its course, and to abide in good faith and willingness by the decree of the court in the premises. In other words, that the community is neutral, that is, taking no active part in the litigation, but will not submit to the mother's authority over the child while in the convent, or send the child away, against her insistence to remain—leaving the court to mediate between them.

In this situation of affairs, the province of the court is exceptionally delicate and difficult; but as the matter has been placed before us, our appreciation of the duty imposed upon the court is, that we are to exercise a purely civil function, and decide a mere. legal question, without in any way trenching upon the religious tenets or vocation of the Catholic church, or the community of the St. Alphonsus Convent of Mercy; and this is made perfectly clear by the statement of the Reverend Mother Superior, that she would not permit the young girl to take upon herself the final vows of the Order of Mercy, until she became twenty-one years of age, as it would be in violation of the law of the church.

The writ of *habeas corpus* is a highly privileged writ and has for its object the release, by judicial decree, of persons who are restrained of their liberty, or detained from the control of those who are entitled to the custody of them.

Provisions have been made in our Code of Practice for the issuance and exercise of this writ, and an analysis of same will simplify the scope of the investigation with which the court is charged.

In treating of the powers which are granted to courts of justice, the Code of Practice declares, that "the first of these is that of issu- " ing the writ of *habeas corpus,* that privilege granted to all free " persons of being released from illegal arrest or detention." Article 789.

In defining the scope and province of the writ, it "provides that the " *habeas corpus* is an order in writing, issued in the name of the " State by a judge of competent jurisdiction, and directed to a person " who has another in his custody, or detains him in confinement, com- " manding him to bring before the judge, the person thus detained, " at the time and place appointed, and to state the reasons for which " he thus keeps him imprisoned, and deprived of his liberty." Article 721.

It will be observed that primarily, the writ contemplates an application being made by a person *sui juris* for a release from *confinement,* or the *custody* of another; but the relief is full enough for a person *non sui juris* to avail of its benefit, as the petition for the writ may be signed by "some other person" in the name of the person who is in confinement—the name of the latter being mentioned therein (Art. 794); and that "he is illegally imprisoned or confined" (Art.

798) and same must be accompanied by a prayer that such person be "released from illegal arrest or detention." Articles 787, 799.

In treating of the manner in which the respondent is to obey the writ, it says, that "obedience to the *habeas corpus* is manifested on " the part of the person to whom it is directed, by his producing the " person to be set at liberty, if that person be in his custody, etc.," (Art. 806) and, in addition, it is the duty of the respondent to state in his return "whether he has, or has not in his power, or custody, the person to be set at liberty; or whether that person is confined by him." Article 807.

It provides further, that "if the person on whom a *habeas corpus* " is served had held the petitioner in confinement, or had detained " him *within three days* preceding the service, or had transferred the " custody to another, he shall state particularly in his answer to " whom, at what time, for what cause, and by what authority he made " the transfer." Article 808.

It further declares that the person kept in confinement, or the petitioner representing such person, may deny all the facts stated in the respondent's return to the writ, and he may "show his detention or " imprisonment is illegal, or that he has a right to be set at liberty, " etc." Article 818.

It provides further, that, on issues thus made up, the judge shall "have the testimony and the reason adduced, as well by the party con- " fined as by the party confining, and shall pronounce on the whole " subject as the nature of the case may require." Article 819.

And, "if it shall appear to the judge from the return and the annexed documents, or otherwise, that there is no cause for arrest or confinement, or if he think that such arrest and confinement can not legally be continued, he *shall immediately set the person at liberty.*" Article 824.

"But if the judge decides that the party can not be released from confinement, nor admitted to bail, he shall remand him to prison, or place him under the same custody in which he was, if the detention was legal; *otherwise he shall place him in the custody of the person to whom the law confides such duties.",* Article 825. (Our italics).

The apparent interchangeable employment, in the foregoing articles, of the terms "illegal arrest or detention," "illegally imprisoned or confined," "power or custody," "illegal detention or imprisonment" and "arrest or confinement," leads to the supposition that

the framers of the Code intended to broaden the scope of *habeas corpus* so, that it would afford ample relief to any one who might be either illegally imprisoned or restrained of liberty, or unreasonably or improperly held in duress and detained from the custody of the person to whom the law confides such duties; and the judge granting the writ was, consequently, empowered upon finding the party unduly restrained of liberty, or held in duress, to immediately set him at liberty, or "place him in the custody of the person to whom the law confides such duties."

The power in respect to *habeas corpus,* that the Constitution confers upon district judges, does not essentially differ from that which is conferred by the Code of Practice. Constitution, Article 115.

Counsel, in his argument, attracts our attention to the fact, that the Constitution only confers upon district judges the "power to issue the writs of *habeas corpus* at the instance of persons in actual custody;" and his insistence is, that it can not, therefore, be issued at the instance of any other person than the person in actual custody. Constitution, Article 115.

In support of that proposition, counsel cites the opinion of our predecessors, in the Matter of Manouvrier, 16th Ann., 257, wherein it was held that the jurisdiction of the Supreme Court "to issue writs " of *habeas corpus,* extends to cases where the parties are *in actual " custody under process."*

That decision was rendered in 1861 when the Constitution of 1852 was in force, and the words italicized were quoted from Article 69 thereof. The court, consequently, correctly declined to take appellate jurisdiction in a *habeas corpus* case that related to the custody of a child.

But the Constitution of 1898 has *ex industria* conferred upon this court appellate jurisdiction of "all matters" appertaining to the custody of children (Art. 85); and the jurisdiction of district judges to issue writs of *habeas corpus* extended to all cases where a party in *"actual custody"* omitting the phrase *"under process"*—thus broadening the relief afforded by the highly privileged writ.

In the case of Bermudez vs. Bermudez, 2 O. S., 181, our early predecessors entertained an appeal in a *habeas corpus* proceeding the object of which was to enable the father to recover from the mother, the custody of the children of the marriage; and the court sustained

the plaintiff's claim, and granted the relief prayed for, and "ordered that the plaintiff's sons and daughter be delivered to him."

That case was decided in 1812—the year in which Louisiana was admitted into the Union.

In Hyde vs. Jenkins, 6 La., 427, the court held that "the writ of *habeas corpus* may be used in civil as well as in criminal and political cases. A tutor deprived of the custody of his ward, or the " husband of the company of his wife, may seek restoration to their " rights by a recourse to a writ of *habeas corpus.*"

Similar views to those expressed by this court, were entertained by the New York Court, in two well considered cases.

People vs. Porter, 1 Duer, (.N. Y.) 709; and People vs. Wilcox, 22 Barbour's, 127.

In the former case, the court employed this language, to-wit:

"But where the person is too young to have a choice, we must refer " to legal principles to see who is entitled to the custody; because the " law presumes, that where the legal custody is, no restraint exists."

And, in the latter case, the court used this language, viz:

"An infant of such tender years as to be incapable of rationally expressing its wishes, which is all I can understand by incapable of making choice, is of necessity under restraint; and in order to determine whether the restraint is legal, the court must determine to whom the custody belongs; and in order to remove the illegal restraint, the court must see that the infant is delivered to its legal custodian. To this extent, I entertain no doubt the legitimate office of our statute writ of *habeas corpus* extends, and to this extent it may be executed by a commissioner at chambers."

Another pertinent expression of judicial opinion on one feature of the instant case, is found in People *ex rel.* Trainor vs. Cooper, 8 Howard's Practice Reports, 294, which is as follows:

"It is insisted that there is no restraint, because the child remains with the respondent of her own free will. This brings up the important inquiry what is legal restraint, as applied to an infant of this tender age? The position of the counsel would undoubtedly hold true of an adult, who, when delivered from the detention, becomes his own master, and is presumed to know where to go, and how to take care of himself, but it is by no means true of a young ignorant child. In such cases, there may be legal restraint, without the exercise of any force or coercion. It is enough that the accused interferes

to prevent the father from forcibly taking possession of the child. The person having the custody of such an infant, without any claim of right, is bound to deliver it over into the hands of the father, whenever he presents himself to receive it; and is not permitted to retain possession of it under the pretence, however true it may be, that the child desires to remain.

"Thus, if a child go to a neighbor's house, and conclude to abide there; when the latter demands it of that neighbor, it is not sufficient for the latter to say to him, 'you may come in and persuade him to go home, and if you succeed in gaining its consent, you may take it, but you shall not compel it to go.'

"He is bound to permit the father to exercise his parental authority of coercion; and if he prevent that, he is guilty of restraint, within the fair meaning of the term."

In Mercein vs. The People, 25 Wendell, 80, the court employed a very similar expression of opinion, thus:

"The question here is not whether the child is actually suffering under duress of imprisonment; but whether there is that kind of restraint which defeats the rights of the father. The respondent having the child under his roof, positively forbids the father to enter his house, except upon terms which a proper self-respect made inadmissible; but if he could submit to the terms, he only had a license to enter the house—'to see Mary'—not for the purpose of taking her under his care and protection. It is impossible to deny that this is such a restraint as defeats the rights of the father, and lays the proper foundation for asking redress by *habeas corpus*.

"In the case before us, it is clear that the child is studiously guarded and kept beyond the reach of the father. The most that is pretended is, in the language of the return that 'she has enjoyed, and so far as the respondent is concerned, shall enjoy entire and undisturbed liberty to go where she pleases.'

"In other words, and this fact is sustained by the proof, she is prepared and resolved, knowing the child's partiality to herself, to maintain Jane in her determination not to go to her father and to repel all attempts upon his part to obtain possession of the child against her will.

"We have no hesitation in determining that the conduct of the respondent amounts in law to a restraint."

Much to the same effect is Moore vs. Christian, 56 Miss., 408.

In People *ex rel.* Trainor vs. Cooper, cited *supra,* we find this further expression of opinion:

"But independent of this overwhelming proof of actual indiscretion, we can not sanction nor give countenance to the doctrine, that such children are to control their own movements, and to select their own places of residence.

"It has no foundation in reason or justice, and is plainly opposed to the laws of the land, as well as the law of God.

"The court must, therefore, go further than merely remove the restraint, by rendering a judgment which shall dispose of the custody of the child, and conclude this controversy.

"It would be an idle ceremony for the court to try a cause without making a decision by which the fruits of the litigation could be reaped. We have a multitude of precedents for our guidance in this particular." In the Matter of Dowles, 8 Johns, 328 (N. Y.), the court ordered the boys to "be delivered to their master and directed the officer to attend and protect them in their return."

In People vs. Mercein, 3rd Hill, 399, the opinion of the court is expressed in these words:

"An order must, therefore, be entered that the child be delivered to the relator."

In People *ex rel.* Nickerson, 19 Wendell, 16, the court made an order that "the child be delivered to its father, and that the care and custody of her be committed to him."

In *In re.* Stillman Goodenough, 19 Wis., 295, a similar doctrine is announced.

In *Ex Parte* Williams, 11th South Carolina, 459, this pertinent expression of opinion occurs:

"A judge would greatly mislead and might seriously injure a youth of fifteen, by telling him that he was free to go where he pleased, if room was left for the misconstruction that he was not bound to obey his father."

The decisions of this court are very well summarized and expressed by an excellent author, in the following language, to-wit:

"The term imprisonment usually imports a restraint contrary to the wishes of the prisoner; and the writ of *habeas corpus* was designed as a remedy for him to be invoked at his instance, to set him at liberty, not to change his keeper.

"But in the case of infants, an unauthorized absence from the

legal custody, has been treated, at least for the purpose of allowing the writ to issue, as equivalent to imprisonment; and the duty of returning to such custody as equivalent to a wish to be free.

"It has been held that the writ may not only issue without privity of the child, but against its express wishes.

"To confine the writ of *hubeas corpus* * * * exclusively to cases of illegal confinement, would be destructive of the ends of justice. I apprehend it is not going too far to say that the interest and welfare of society require, that, under peculiar circumstances, the fact that the child of tender years is detained improperly from the person entitled to its possession, is sufficient ground to maintain the writ of *habeas corpus*."

Hurd on *Habeas Corpus,* page 453.

Much to the same effect is the French jurisprudence, as will appear from the following quotation from a treatise of Pothier, to-wit:

Pothier in his Traite des Donations Des Personnes et Des Choses, Vol. 13, pages 429-430, referring to that feature of the paternal power which confers upon parents the right to govern with authority (gouverner avec authorite) the persons of their children until they should have reached the age to govern themselves, says:

"De la premiere partie de la puissance paternelle, nait le droit qu'ont les pere et mere de retenir enfants supres d'eux ou de les renvoyer dans tel college ou autre endroit ou ils jugent appropos de les renvoyer pour leur education.

"De la il suit qu'un enfant soumis a la puissance paternelle ne peut entrer dans aucun etat, se faire novice, faire profession religiuse, contre le consentment de ses pere et mere, sous la puissance desquels il est. Cela a ete juge contre les jesuites au profit de Me. Airault, lieutenant-general d'Angers, par arret de 1587, contre les feuillans, par arret de 10 aout 1601, contre les capucins, au profit du president Ripault, par arret du 24 Mars 1604. Ces arrets sont fondes en grande raison. L'etat religieux n'est que de conseil evangelique or il est evident qu'on ne peut pas pratiquer un conseil evangelique par le violement d'un precepte, tel qu'est celui de l'obeissance a ses parens, qui nous est prescripte par le quatrieme commandment de Dieu. D'ailleurs, la profession religieuse, quoique bonne et utile en soi, ne convint pas neanmoins a tout le monde; tous ne sont pas appele a cet etat. Or les pere et mere sont presumes etre plus en etat de juger si leurs enfants sont appeles a cet etat que leurs enfans, qui n'etant

point encore arvenus a la maturite de l'age, ne sont pas encore capables de juger par eux memes de l'etat qui leur convient. (Voyez les Capit de Charlemagne, liv. 1, ch. 5)."

The foregoing are a few of the pertinent opinions exppressed by courts of other States on the question at issue; and very many others of like import might, with perfect propriety, be cited, though we do not deem it necessary. Those quoted, in our opinion, are in keeping with the provisions of the Code of Practice which have been cited, as well as the provisions of the Constitution, and the decisions of this court.

Altogether, they constitute a complete consensus of judicial opinion on the subject, which is at once authoritative and controlling.

Consequently, we are of the opinion, that *habeas corpus* is the appropriate remedy, and that the relatrix has brought her case clearly within the principles announced; and that she is entitled to the relief she demands.

For the foregoing reasons, we are of the opinion, that the judgment appealed from is erroneous and must be reversed.

It is, therefore, ordered and decreed, that the judgment appealed from be annulled and reversed; and it is further ordered and decreed that the writ of *habeas corpus* be reinstated and maintained.

It is further ordered and decreed, that the relatrix, Mrs. Adelina Prieto, have the custody and control of her daughter, Maria Theresa Prieto—she being yet a minor and incapable of selecting and establishing a domicile of her own choice, against the will and consent of her mother.

It is further ordered and decreed, that the respondent, St. Alphonsus Convent of Mercy, through its Reverend Mother Superior, permit and allow the relatrix to have the custody, and exercise control over said Maria Theresa Prieto, without exercising any restraint over her, or making any opposition thereto.

It is further ordered that all costs be taxed against respondent and appellee.

Rehearing refused.

BREAUX, J., dissenting, read a separate opinion.